Staples, J.
In considering this case I shall concede that the appellee within the appointed time made his election, to purchase the property in controversy, and that he duly notified the appellant of the fact. This, however, did not comprise the whole duty of the appellee ; under his contract he was required to do something more. So soon as he elected to make the purchase, it was incumbent upon him to pay the entire amount of the purchase money, or to execute his bonds and promptly discharge them as they respectively arrived at maturity. Has he shown such compliance with his contract as entitles him to the assistance of a court of equity, or such circumstances of excuse as relieve him of the obligation of performance ? Ho one can read this record without the clearest conviction that the appellee in exercising his right of election was mainly influenced by the hope of deriving an undue advantage from the act of the Confederate Congress reducing the currency one-third in value ; that it was his deliberate purpose to force upon the appellant this currency at its nominal value in payment of the purchase money, and failing in this project, he was deliberately neglectful of the obligations of his contract until *486 the currency had become almost entirely worthless by the rapidly declining fortunes of the Confederacy. In this connection it may be proper to consider the legislation referred to as a part of the history of the times, and as explanatory to some extent, of the motives and conduct of the parties. By the act of February 17, 1864, the holders of the treasury notes above the denomination of five dollars were allowed, until the 1st day of April, to fund the same in four per cent, registered bonds ; on all such notes not so funded, a tax of 33J- cents was levied for every dollar promised on the face of such notes, and holders were authorized to exchange them for the new issue at the rate of three of tbe former for two of the latter. The same provisions were substantially, enacted in respect to the notes of the denomination of five dollars, except that the holders were allowed until tbe first of July to fund the same. The effect of this legislation upon the currency will be remembered by all familiar with the history of that period. Thenceforth it was not received in the payment of debts, or in the purchase of property, except at its legal rate of depreciation. So far as this record discloses, throughout the year 1864, the appellee did not evince the slightest anxiety to comply with his contract unless he could use this currency as a medium of payment. In his letter of the 25th February, he shows that he is well informed touching the provisions of the act of Congress ; aud then, for the first time, ho discloses his purpose to purchase the property now the subject of controversy. In his letters of May 7th, May 10th, and July 6th, he insists upon his right to pay the purchase money in the old currency, and in one of these letters he quotes certain provisions of the contract in vindication of his opinion. It is apparent from the whole correspondence,that it was his determination not only to pay in this currency, but to exercise this privilege from time to time down to the 10th of June, as best suited his convenience and his interests ; thus forcing *487 upon the appellant the necessity of funding within twenty days the notes received, or of submitting to a loss of one-third of the purchase money in exchanging it for the new currency. If, at the close of this correspondence on the 6th of July, the appellee had filed his bill demanding a specific performance, it is clear that a court of equity would not have afforded him relief upon the terms suggested in these letters. The appellee did not propose to apply the treasury notes in payment according to their fixed legal value. His purpose was to compel the appellant to receive them at their nominal rates, in other words, to accept as of the value of one dollar, a currency worth, by operation of law, only two-thirds of a dollar. Under the provisions of the contract the appellee was authorized to pay in such funds as should be current, or receivable in payment of Virginia State taxes at the respective dates or times of payment. It is notorious that these notes were not current after the passage of the act in question, except at the value fixed by that act. ■'Were they receivable in payment of State taxes ? A simple reference to the legislation of that period will answer the question. By an act of the Virginia legislature, passed March 3d, 1864, the act of September 3d, 1863, authorizing the receipt of Confederate notes in payment of taxes, was repealed, and in lieu thereof it was enacted that treasury notes issued prior to the 1st of April 1864 should be received in payment of taxes and other public dues until 10th of December 1864; but only at the rate of sixty-six and two-third cents for each dollar of said notes. It is clear, then, that the appellee, in offering this currency at its nominal value, was not acting in compliance with his contract in its letter or spirit. He was attempting to impose terms which the appellant was well justified in rejecting. His offer of performance gave him no claim to the interposition of a court of equity. Does the evidence place.his conduct, subsequent to the 1st of July, in a *488 more favorable aspect ? It will be observed that the appellee’s letter of the 6th of July makes no.demand for the performance of the contract, it contains no promise to pay the purchase money, or any part of it, nothing is said in regard to the execution of the bonds. As the appellee had been defeated in his effort to pay in the old currency, it was to be expected that some new arrangement would be suggested, some proposition made, in regard to the payment of the purchase money or the execution of the bonds. But nothing of the kind is intimated, and the reader might reasonably conclude that the appellee no longer considered himself bound by the contract. Iff or do we hear from him until February 1865, with the single exception of the message sent to the appellant in Iff ovember 1864, that his money was ready for him. To this the appellant, I think, very properly replied,. “ that it was customary for the man who owed the money to hunt up the creditor.” Certainly it cannot be inferred from this that the .appellant was unwilling to receive the money then in circulation. All the circumstances show, the letters clearly indicate, that' his only objection was to the currency embraced by the provisions of the act of Congress. If the appellee w7as honestly desirous of fulfilling his obligations, why did he not seek the. appellant in person and make the tender. It was said that the appellant resorted to the humiliating expedient of dodging the appellee to escape a tender of the currency. There is some evidence that on one occasion, in the early spring, the appellant attempted to avoid an interview with the appellee, probably with the object suggested. But there is no pretence that this was done at any subsequent period. The appellant was iu Staunton on the 26th and 28th of April, and had repeated interviews with the appellee. It is not pretended there was any offer to pay on either of these oeeasions. He was oftentimes at Mount Sidney, ten miles distant from Staunton, engaged in the manufacture of articles for the *489 government, as was well known to the appellee. He resided at Luray, in Page county, only twenty miles from Woodstock, where the appellee spent a large portion of his time in the year 1864. The appellee had no difficulty in sending messages and letters by mail and by private hand. In his letter of July 6th he laments he had not in the contract reserved the right to make a deposit of the money in a Staunton bank, instead of being compelled to go to Luray to make a tender. But he took care never to go to Luray. He admits his obligation to seek the creditor. Why did he fail to do so. The evidence furnishes an easy explanation of his motives and his conduct. He preferred to invest his funds in the more profitable and remunerative business of trade and speculation. It is proved that in the autumn of' 1864 he boasted that be had the money to pay for the property ; and being advised that he had better do so, he expressed his- intention first to make use of it in -another speculation. And in December 1864, he declared that he had intended paying the appellant some money, but upon reflection he had concluded to invest it in cotton and tobacco ; that the money was not quite bad enough yet; that he wished it to get a little worse that it was worth twenty cents in the dollar when he made the purchase ; at that time it was worth about six cents ; and he intended to keep it until it was depreciated to one or two cents in the dollar before he paid the appellant. Accordingly, we find him for the first time seeking his creditor, taking with him a witness, and making a formal tender in February 1865, when the currency was depreciated in the ratio of sixty-five dollars for one. And in his answer-he gravely declares, that though often prevented from access to complainant by the accidents of war and by his active avoidance, he was at last successful in meeting him and making a full tender of the entire sum due upon the whole property in Confederate treasury notes. And this tender thus [made, is relied on as *490 giving the appellee a clear equity to a conveyance of the whole property free from all incumbrances. In my judg- ' ment it is not entitled to the slightest consideration, because made long after' the maturity of two instalments of the purchase money, and because made not in the conscientious discharge of the obligation of his contract, but in accordance with a deliberate purpose to impose upon the appellant a currency which had substantially ceased to perform the functions of a circulating medium. The appellee was in default in regard to the instalment of fourteen thousand dollars due in May 1864, and he was also in default in regard to the like sum due in November following ; and this too of deliberate will and purpose. His reparation for this delay was a tender of forty-two thousand and five hundred dollars in notes of the value of six hundred and fifty dollars in coin. What are the reasons assigned for this default ? It is said that looking to the substantial justice of the case, and supposing the appellee had made his election in May 1864, he had then paid more than he was required to pay, he had in fact paid all the instalments to November 1864, and eighteen thousand dollars besides; he was, therefore, in no default in paying the respective instalments as they fell due. I think the answer is obvious. The promptness of the appellee under one contract is not an equivalent for his default under another and wholly different contract. At the time the payments were made to Peyton, the appellee had not then exercised his right of election. These payments were made on the first purchase, in accordance with a right reserved in the original contract, and were so intended by the appellee. He alleges in his answer, that they constituted full payments of all that he would have owed on that contract. It is to he observed that they were made in the old issue of treasury notes, and in this respect were highly advantageous to the appellee in enabling him, upon easy terms to discharge the vendor’s lien. When, therefore, he *491 subsequently elected to purchase the moiety now in controversy, his obligation to pay punctually the several instalments of the purchase money as they matured, to comply in every particular with the provisions of the second contract, was as complete as though the first had not been made or no part of the purchase money thereon had been paid.
The appellee cannot refer an act done, or right exercised under the first contract, to the right and obligations incident to the second. As the appellee never considered his payments as tantamount to the performance of his second agreement, it is idle to say that this court can so regard -them.
Other grounds were taken in the argument by the counsel for the appellee ; but it is unnecessary to consider them: none of them are sufficient to justify the delinquency of the appellee. In every view of this case, I am satisfied he is not entitled to a specific execution. No principle is better settled than that which requires that the party seeking specific performance must have shown himself ready, prompt and eager. In Benedict v. Lynch, 1 John. Ch. R. 370, Chancellor Kent, upon a careful review of all the authorities bearing upon this subject, uses the following language : “It may then be laid down as an acknowledged rule in courts of equity, that where a party who applies for a specific performance has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay, and where there is nothing in the conduct of the other party that amounts to an acquiescence in that delay, the court will not compel a specific performance. Nor is it necessary for the party resisting the performance, to show any particular injury or inconvenience; it is sufficient that he has not acquiesced in it, but considered it as releasing him.” And in Bowles v. Woodson, 6 Gratt. 78, similar views were announced by this court. Judge *492 Allen said, “as the application for a specific performance-is addressed to the s&und discretion of the court, he who-asks it must have shown himself prompt and willing to comply with the obligation of the contract on his part; and the prayer will not be granted if it would be inequitable towards the party against whom the prayer is-made.”. Now, it is true, that amere default in the payment of the purchase money, as a general rule, is not a, sufficient reason for refusing a specific performance; because the default admits of compensation. In most cases the interest is regarded as an equivalent for the nonpayment of the purchase money. This rule, however, is not adopted if any injustice is thereby done the vendor. It must be certain that he has sustained no damage by the default of the vendee, and the payment of the-principal with its interest will place him in the position he would have occupied, had there been no default. It must appear there has been no change of circumstances-affecting the character of the contract, or the rights and obligations of the parties, and that compensation for the-delay can be fully and effectually made. And in all such cases the burden devolves on the vendee to account, in a reasonable manner, for his delay ; and also to show that the relief he asks is just and equitable. 2 Story Eq. Jur. § 776; Taylor v. Longworth, 14 Peters. U. S. R. 172.
The principle upon which the purchase money with its interest is generally regarded as compensating for the delay, is obvious. As the contract is to pay in a permanent currency, having a fixed legal value, the vendor obtains by the decree of the court precisely what he agreed to receive. He is paid for his property at the valuation fixed by himself. The court merely executes the contract of the parties as they made it. These are familiar principles : Can they be properly and justly applied to contracts for the sale of real estate based upon Confederate currency where the vendee was in default? If-the vendor contracted to sell for a certain sum, payable in *493 that currency, and the veudee failed to pay at the appointed time,, can it be said that the scaled value in coin is a fair equivalent for such currency, or a j ust compennation for the delay ? Is a court of equity justified in holding that the vendor would have parted with his propei’ty oil such terms. If the appellee had proposed to purchase one moiety of this hotel and pay therefor the sum of two thousand two hundred and sixty-four dollars in gold, after the termination of the war, no intelligent mind can suppose the appellant would have accepted this proposition. How is it possible for the court to appreeiate the motives or necessities that induced him to sell, or to know the uses he might have made of the money had it been paid, or the losses he may have sustained in failing to receive it. The contract this court is asked to execute is not the one made by the parties. The equity raised up in behalf of the appellee is one growing out of his own default in performing his agreement.
The rule sought to be enforced here, is the very reverse of that established in White v. Atkinson, 2 Wash. 91. In that case the sale was made in 1779, during the -existence of paper currency. The purchaser was in default in the payment of the purchase money. The court, as a condition of relief, decreed that he should pay the fair value of the land at the time of the sale, instead of the value of the currency agreed on. The rule is also in violation of the principles and the spirit of the act of 1867 ; which authorizes courts and juries to adopt the fair value of the property as a just measure of recovery. This act was passed under the universal conviction that as real estate did not advance during the war with the depreciation of the currency, so the specie value of the currency is in very few cases the fair value of the property, or a just measure of recovery. At the last term of this court at Staunton, the act in question was unanimously sustained as constitutional, and as a wise and beneficent measure of legislation.
*494 In this case competent and reliable witnesses estimate the Virginia Hotel at forty thousand dollars in a sound cm'renoJ• The appellee, in November 1863, purchased one moiety of the property at forty-two thousand and £ve p-^Q^gq dollars, and all the personal effects attached to the hotel at forty thousand dollars, in Confederate treasury notes, then at a depreciation of sixteen dollars for one in gold. In part payment of the purchase money he sold and delivered to the appellant sixteen slaves, estimated at $34,600. The residue he paid in what was known as the old issue of Confederate notes. He now seeks a conveyance of the other moiety at $2,264.11, the 'specie value of the contract .price, and probably one-tenth of the real value of the property. It must be borne in mind that -this was not a fair contract of hazard under which either party assumed the risk of loss with a probable chance of gain. Nor was it in the nature of a continuing offer to sell for a permanent currency, upon which the vendor was certain to receive the estimated value of his property. Under the agreement the appellee could sustain no loss in any contingency. If the currency continued to depreciate, and the property secure, he had only to exercise his right of election ; and, under his construction of the agreement, he might make his payments as suited his convenience and his interests. Tew men could pronounce such a contract fair in its terms, or free from objection in its attendant circumstances. I am aware that mere inadequacy of consideration is no defence to a specific performance, unless it amounts in itself to conclusive evidence of fraud. This principle received the sanction of this court in Hale v. Wilkinson, decided at the last Wytheville term; supra. It is to be observed, that in that case the purchase money had been fully paid and accepted in discharge of the vendee’s obligation. It was also held in that case, that as the vendee was in default in paying the purchase money, the *495 vendor was not bound to receive it when subsequently tendered, and had he refused it because not punctually paid, equity would not compel him to execute the agreement. The fact that the money was rapidly depreciating made time of the essence of the contract. And while it is true that mere inadequacy of consideration is not sufficient of itself to defeat a specific performance, yet in all such cases a court of equity will closely scrutinize the conduct of the party insisting on the contract, and if he be in default, it will leave him to such remedy as he may have in a court of law. This doctrine is clearly expressed by Chief Justice Marshall in Garnett v. Macon, 6 Call. 308 ; and I shall content myself with a single extract from his opinion. He declares, “ That although mere inadequacy of price is not a sufficient ground for a court of equity to refuse its assistance, yet, if an unreasonable contract be not performed according to its letter, equity will not interfere. And there is no difference between a contract unreasonable when made, and one which becomes so afterwards, if the applicant be in default.” See also Kirby v. Harrison, 2 Ohio St. R. 326; Merritt v. Brown, 19 New Jer. Eq. R. 286; Westerman v. Means, 12 Penn. St. R. 97. Piatt et als. v. Law & Campbell, 9 Cranch U. S. R. 456, 449.
There is one other fact disclosed by this record, worthy of serious consideration. The written agreement contains a stipulation binding the appellant to convey the hotel by a good and sufficient deed in fee simple with general warranty. Under the decree of the circuit court the sum ascertained due is only to be paid the appellant upon his conveying to the appellee an unencumbered title to the said Virginia Hotel property. It appears by the report of the commissioner, there are subsisting liens upon this property to the amount of seven thousand dollars certainly. How much more there is, we have no means at present of ascertaining. The commissioner states that after the most diligent enquiry he has been *496 unable to ascertain with any degree of accuracy what incumbrances still exist. The hotel has been repeatedly ■ sold since the year 1850, and notes given for the purchase money, running through a period of twenty-five years ; and these notes have passed into the.'hands, .in many instances, of unknown parties. Upon some of them suits have been brought to enforce the vendor’s liens. There are also judgments and deeds of trust, many of which it is thought have been satisfied. Under these circumstances it is utterly impossible to form even a conjecture of the amount' of these liabilities ; all of which, whatever they may be, the appellant under his contract and the decree of the-Circuit court is required to discharge and to convey to the appellee an unencumbered title. In consideration of which the appellant receives the sum of two thousand two hundred and sixty-four dollars and eleven cents, with interest. Such is the operation of a decree for specific performance. A case of greater hardship has rarely been brought before a court ■of equity. A hardship not in any wise the result of appellant’s conduct, but produced by circumstances over which he had no control; attributable in a great degree to the default of the appellee, and the influences consequent of an unsuccessful revolution. The appellant himself had only purchased, the property shortly before his sale ; and it is reasonable to suppose he was wholly ignorant of the extent of these liens, or that he relied upon the purchase money he was to receive as the means by which they were to be removed.
These considerations, in my judgment, are conclusive against the interference of a court of equity in this case. It is to be borne in mind, that specific performance belongs rather to the extraordinary jurisdiction of the courts of chancery. It is not a matter of course ; every such application is addressed to the sound-discretion of the court. In all such cases the question presented is, is it better for the furtherance of justice, considering all the *497 circumstances, to give the party specific execution, or to leave him to his legal remedy for damages. Turpin v. Jackson, 5 Rand. 505. I shall not stop to multiply authorities upon this point. The principle js too familiar to require argument or illustration in its support. The subject receives an exhaustive discussion in the case of Willard v. Tayloe, 8 Wall. U. S. R. 564. Some of the views of Mr. Justice Field are so appropriate to this case, I cannot refrain from quoting them : “ It is true, (he .says,) the cases in which the discretion of the court is asserted, arose upon contracts in which there existed inequality or unfairness in the terms, by reason of which injustice would have followed a specific performance. Eut the same discretion is exercised where the contract is fair in its terms, if its enforcement from subsequent events, or even collatteral circumstances, would work hardship or injustice to either of the parties. Numerous cases may be cited to the same effect. The clear result of the authorities is, that equity will not decree the specific execution of a contract made under a clear misapprehension or mistake of important and material facts, or of hard and unconscionable bargains, or where the applicant for relief has been in default, and by the force of subsequent events of a change of circumstances, the execution of the contract would entail great loss and hardships upon the adverse party. Tested by these principles, this ease does not commend itself to the favorable consideration of a court of equity.
Although the appellee asserts his claim by answer, it is still an application for equitable aid, and is to be governed by the well settled rules appropriate to bills for specific performance. According to the usual practice, when specific performance is denied, the court declines to interfere either way; but leaves the parties to their respective rights and obligation at law. In this case, however, if the bill were dismissed, the appellant having the legal title might at once institute his action of eject *498 ment, and recover the property in controversy. The dismissal of the bill would, therefore, simply result in a renewal of the litigation in another forum, and an ultimate return to a court of chancery to settle the question of rents and profits, and of compensation for improvements. Upon familiar principles the court having possession of the case will terminate the controversy by adjudicating the rights of the parties, and administering such relief as may be appropriate to the equity forum. For these reasons, I am of opinion the decree of the Circuit court must be reversed, and the cause remanded for further proceedings ; upon which a decree is to be rendered for a partition of the property if it can be conveniently made, and also for a full and final settlement of all matters of account between the parties.
The other judges concurred in the opinion of Staples, J.
The decree was as follows :
The court is of opinion for reasons stated in writing and filed with the record, that the appellee under and by virtue of the contract of the 19th November 1863, marked exhibit A, and filed with the bill, is entitled to one moiety of the real estate known as the Virginia Hotel property in said contract mentioned, as purchaser thereof from the appellant; but is not entitled to a specific execution of the contract for the purchase of the other moiety ; that the appellant and appellee are tenants in common of said property ; that the appellant is entitled to partition of the same, and to the stipulated rent for one year of his moiety of said property, and to one-half of the fair rental value of the same since the termination of said year, subject to a deduction for one-half of the value of all useful and permanent improvements put upon said property by the appellee-; and that the appellee is bound to account with the appellant for the pur *499 chase money of the moiety of said property purchased by him as aforesaid, and to pay any balance due thereon ; or if he has over-paid the same, the appellant is bound to account for the amount of such excess ; and the appellant is bound to relieve said property of all incumbrances thereon at the time of said purchase ; and that the decrees appealed from are erroneous. Therefore it is decreed and ordered that the same be reversed and annulled, and that the appellee pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here. And it is further decreed and ordered that this cause bo remanded to the said Circuit court, that all proper accounts may be taken, and all further proceedings had therein which may be necessary or proper in order to a full and just settlement of the whole matter, and a final decree in the cause according to the rights of the parties as hereinbefore adjudged and declared.
Decree reversed.